Petitioner of the Board, and Ms. Wheeler for the Intervenor, United Steel Workers. And I'm going to go ahead and move on to Case Number 2, which is 19-11615, Ridgewood Health Care Center v. National Labor Relations Board. And I show that we have Mr. Ramey for the Intervenor, United Steel Workers. And Ms. Sheehy and Ms. Wheeler have agreed to split their time. Mr. Ramey, you've decided to begin with 12 and reserve 3 for rebuttal. May it please the Court, Travis Ramey for the Petitioners. This case arises from Ridgewood's takeover of operations of a nursing home from a company called Preferred, who had a partially unionized workforce. The Board found that... Mr. Ramey, I'm sorry, this is Judge Newsom. Can I ask you to scoot a little bit closer to your phone? Yes, Your Honor. This case arises from Ridgewood's takeover of operations of a nursing home from a company called Preferred, who had a partially unionized workforce. The Board found unfair labor practices. Despite the respect the Court gives to the Board's decisions, it should decline to enforce this one and decline to impose a bargaining obligation on a small business that has operated without a union for nearly 7 years now. Because successorship is really the central issue here, I'd like to begin with how to count majority status for purposes of successorship, and then move on to discuss the interrogation finding and the right line analysis. The Board's successorship sort of majority status analysis really depends on tapping the substantial representative compliment at 101 employees and then employing this one in, one out analysis as far as how to deal with the employment. There's no per se rule that you use 101 just because that's the number on the takeover date. There are cases talking about sort of a factual analysis. And the facts don't back up tapping the substantial representative compliment at 101. Ms. Brown, who is the majority owner of both the Ridgewood company and the Ridgeview company, disputed that 101 was adequate to provide the care that she wanted to give to the residents. She repeatedly testified that she wanted more people, had no particular number in mind. The company made 107 offers. I think we actually say 105 in the briefs, but 107 is what's in the testimony. And there's no evidence that Ridgewood was looking to hire more employees. The former preferred employees were hired but did not show up to work. It made 22 additional hires in the following six weeks. And as of mid-November, on page 1099 of the record, it shows that they were carrying 112 employees within the bargaining unit. And as of Ms. Brown's testimony at the hearing, I think about a year later, she testified that there were between 103 and 105 employees in the bargaining unit. So the evidence just doesn't really back that up. And neither does the cases that the board relies on, the JD Landscaping, Jennifer Matthew Nursing, and the Pacific Custom case. None of them do this one-in, one-out analysis that the board relies on. So if what you do is add in Davis, Eads, and Sickles, the three employees that were qualified and then disqualified by the no rehire rule, you get a 52-52 count. And that's not a majority. At that point, the majority status would really depend on what to do with Ms. Vegas Wilson, who the board also concluded was discriminatorily excluded, but who had failed a physical and therefore was not eligible to report to work on October 1st. The board expressly reserved that question in its decision. If the court concludes that Ms. Wilson survives the right-line analysis, then it would probably be appropriate to remand that question to allow the board to decide whether to count her in the case. So if the board assumes that Ridgewood would have hired everyone who was qualified, which is the most appropriate analysis, you end up with 108 members of the substantial representative complement. And only 52 of them are former preferred employees, and 52 out of 108 is not a majority. Let me ask you, excuse me, this is Judge Baker, Mr. Ramey, the numbers game is what the board calls this, but I want to delve into it a little bit, because you said that Ridgewood made 107 offers. That 107 offers, were the majority of those to former preferred employees, or where did the numbers break out on the 107? I know there were four that were former employees and two were no-shows and two declined, but out of the 107, how does that exactly break out? My recollection, Your Honor, is that 49 preferred employees accepted, four offered and were not accepted, and did not accept. Two declined expressly, and two just did not show up to work. So there were 103 acceptances. Had the four preferred employees accepted and the other two shown up to work, you would have ended up with 105 in the pool then, which would have been a preferred majority. So Ridgewood made enough offers to preferred employees for them to have been the three employees who were excluded by the no-re-hire rule, or adding in Ms. Wilson, who was excluded because of Ms. Cooper's statement about her being in an altercation. It's a little ambiguous as to whether it was a physical altercation with a co-employee at another nursing home. And all of those offers were made at the same time? They were all outstanding at the same time, is that right? My recollection of the record is that most of the preferred offers were made by mid-September, and then the non-preferred, because the preferred applicants were all interviewed and applied earlier, the preferred applicants sort of came in first. But there was some overlap where you had preferred and non-preferred, and then there was hiring more people, more people, more people. And there was no particular cap number in mind. It just needed to get the numbers up above the 80 or so that preferred was carrying, because the employees were working a substantial amount of overtime. And also you had Ms. Brown's testimony that she didn't feel like that 101, where they started, was sufficient to provide the level of care that she wanted to provide to the residents of the facility. As to the interrogation issue, and this loops in with the animus analysis as well, the interrogation issue is really relatively straightforward. There's not a great dispute that to show interrogation, a question has to have a reasonable tendency to coerce or to interfere with Section 7 rights. And the board never, neither the board nor the ALJ, ever made a finding that the questions that were asked to the applicants had that reasonable tendency to coerce or interfere. And it's not a per se rule that such a question would coerce or interfere. In fact, there's an 8-factor non-exclusive analysis that this court in TRW and the predecessor court in Delco Remy and Gaylord has laid out these 8-factor tests to determine whether something is coercive. And that analysis is just absent from both the ALJ's opinion and the board's opinion as well. And absent that, finding that there was a reasonable tendency to coerce or interfere, the Section 881 violation based on interrogation just cannot stand. To do so would be to allow... As to the issue of coercive interrogation and looking at these 8 factors, in some of the interviews, the employees or when the interviews were going on, some were questioned about whether they were a member of the union. Isn't that correct? That's correct. And so looking at the 8 factors, did the employer have a valid purpose in obtaining the information? Well, to answer your question, Your Honor, my understanding, one, I think there was a dispute, as we disputed that the questions were ever asked, but an employer might ask a question for that purpose simply to try to find out what the contours of the bargaining unit are. It's not always perfectly clear from a bargaining unit definition which jobs fall in that bucket. What I would say also about the multi-factor test is it's really not this court's job to do that analysis in the first instance. That's rewriting the board's opinion for it and affirming its opinion based on alternative reasoning, which this court does not do. Beyond that, the outcome of this multi-factor test isn't obvious because there are factors that cut, even if the court concluded the place and manner of these questions leans towards coercion. There are factors that cut the other way. The first factor is the employer's history of attitude towards its employees. Well, there's sample evidence in the record that the sister company at Ridgeview had good relationships with its union. And the fifth factor is truthfulness of response, and there's no evidence that any of the Thank you. So there's no evidence anyone felt compelled to lie. So the outcome of this multi-factor analysis isn't obvious. Moving on to animus, just to discuss the right-line analysis briefly. This is sort of a three-legged stool, the way the board laid out animus, and there seems to be at least consensus with the board's brief that if you refer to animus, you need to remand the case back to the board because it's not perfectly clear they would reach the same conclusion. The first leg and most problematic is inferring animus from Cooper's January comment to Bollinger. That comment's just too temporally remote for retroactive use. It's three to five months after, depending on sort of when you count the date, but after the hiring process decisions and takeover. The case is discussed using contemporaneous unfair labor practices for animus. That's not contemporaneous, and sort of a good analogy may be the way the court analyzes temporal proximity in the context of retaliation cases. The R.J. Korman, K.W. Electric, and S.E.A. Tissue cases the board relies on. We're talking about conduct that was most within a few weeks. Beyond that, to the extent that, at the time they were hiring, she wasn't a decision maker, she wasn't even a Ridgewater Ridgeview employee at the time. There's no evidence she had any... Mr. Ranney, let me ask you just a quick question. This may be just clearing away underbrush, but with respect to Cooper's statement, I think I understand from the brief that you don't deny that the threat was improper. I know you said at the very outset of your argument that we should decline to enforce this order. Is there some aspect of this order that we should enforce with respect to Cooper, even if there's no connection, no temporal or qualitative connection? I think the board has asked that Ridgewood cease and desist from threatening. Should we enforce that aspect of the order? Judge Newsom, by my count, my time has expired, so if I have permission to answer this question. Yes, Judge. We did not include in our request for review that it reviewed the court's finding of an unfair labor practice that Cooper's statement would constitute a ULP. Of course, we dispute that the statement ever happened, but the board found that it did. There's testimony to that effect, so it is not part of our petition for review, and I would have to concede that on that issue, that it is in fact an unfair labor practice the board would be entitled to some reinforcement on just that narrow question alone. Thank you so much. You've reserved three minutes. Let's hear from Ms. Sheehy. Good morning, Your Honors. This is Barb Sheehy with the National Labor Relations Board. I'm going to start in fact where counsel for Ridgewood started, because I think it's a good place to talk about the numbers, and I think that I'd like to clear up some things. There were a lot of references to things in the transcript, to things that people testified to, and what's in the record, but I think the starting point has to be the findings of the board, irrespective of who said what at the hearing. There are specific findings of the board as to the number of applicants, the dates that they submitted applications, and the number of offers. So I want to start there. My focus is going to be uniquely on the four corners of the board's decision and order, which I think is the proper focus. So there were 65, by August 30th, that was the deadline imposed by the employer. By August 30th, 65 preferred applicants. So these are the predecessor employees. 65 preferred applicants expressed an interest in having a job after the takeover. Again, August 30th was the date imposed by the employer. Of those 65, they were all interviewed, and by September 16th, all letters, my understanding is all letters went out on September 11th, offer letters to 51 people that were preferred employees. There was a return date on those offer letters of September 16th. By September 16th, according to the judge's decision and then the adoption by the board, by September 16th, all 51 offers to preferred employees had been accepted. Then the employer undertakes an interview process for non-predecessor employee applicants. The findings by the board showed that there were 111 non-preferred employee applicants. According to the majority of the applications that were submitted, they are dated starting with September 13th. All of the offers, I just want to make clear on the timing, all of the offers to preferred employees had gone out by the time applications are dated and submitted to the employer from non-preferred employees. The record does not indicate exactly how many offers went out to non-preferred employees. I'm sorry, the decision doesn't identify the number, but what we know is on October 1st, 101 employees showed up for work, 49 of which were preferred predecessor employees. This is just news from Ms. Sheehy. Can I ask you a quick question? Sure. I think I'm just having a hard time figuring out the internal consistency of your position because your position is that October 1 is the magic date. On October 1, hiring was effectively capped. I know that Mr. Ramey disputes this, but the hiring was effectively capped and that Widgewood had manipulated the hiring to avoid a majority. The record shows that they made offers to, for some reason I have in my notes, 53, but you say 51. Whether it's 51 or 53 former preferred employees, that's more than enough to constitute a majority. How could Widgewood simultaneously have intended to cap its hiring at 101 and given offers to 51 and or 53 preferred employees and had animus and anti-union animus to avoid a majority? Sure. I know it's a little complicated, but what we look at is there were 51. We know that the employer knew that the maximum number of preferred employees could be 51. It couldn't be more than that because they didn't offer it to more than that. If the employer offered, and I'll take that it's in the record from opposing counsel, that there were 107 offers total, that means then that there would not have been a majority. So at the end of the day, certainly the numbers shook out that there was not a majority. The number of people didn't show up. You had 49 to 52. But on top of that, even if things had played out and everybody showed up for work and everybody accepted employment, you still would only have 51 preferred applicants and then 56 non-preferred. So not only on the day of the takeover, and I don't think it's a magical date, I think it's just the board has to pick a date, right? And so they take, and the board, let's be clear, the board didn't cap the number at 101. The employer decided that as the date that it took over on October 1st, that 101 employees complied with Alabama statute for properly staffing the facility. And it's also entirely consistent with at least the past two to three years of average staffing. And in fact, 101 was at least 17 higher than what it had been the prior year. So let's be clear. So with our analysis then, I guess, is the denominator for our analysis 101 as measured on October 1? Because if so, I don't see how 51 or 53 offers to preferred employees get you there. Well, no, because respectfully, I think what we're doing there in that question is apples to oranges. It's 101 because that's the number of people that came to the office, which is on that date of the 101, how many were predecessor, in fact, employees. And that number is... Don't you say how many offers? I mean, we're looking at animates, right? So you say how many offers were made to preferred employees, and that number is either 51 or 53. I'm not sure which. But if the numerator is number offered, why is... Maybe I'm just totally missing something. No, no. I think it's probably not doing a good job of explaining it. But I think if you look at it, let's look at it in two different buckets. Let's look at it. I'll try it this way. Let's look at it as the offers going out, because all of this is complicated, right? Because the employer is the one with all the knowledge in terms of how many it's going to staff, how many letters it's going to send out. And so on the pre-October date, if the court wants to focus on those, 51 offers went out to preferred employees. And then consistent with what the board viewed as a numbers game, the employer extends offers to 56. So weighting the final numbers, if everybody shows up to work, in favor of avoiding a bargaining obligation. And then in fact, what happened was you still had a number of the non-preferred employees. So then if you look at the actual... the numbers game still worked in the sense that two preferred applicants didn't show up for work on October 1st. And I guess a number of non-preferred applicants likewise didn't show up. So even if you look at it as two separate steps, at the end of the day, the board viewed what happened and determined that the employer's end game in this was to ensure that it avoided a bargaining obligation. So it sent out fewer offers to preferred applicants. And then at the end of the day, it ensured that the number of people that came on roll was in a majority of non-predecessor employees. Counsel, this is Judge Branch. One question following up on Judge Newsom's point, because there are no-shows, and when you're offering these number of offers, I think that's a fair assumption that there are going to be no-shows. When you cut... your argument is that the discrimination was in place with the offers and it worked out with who showed up. But when you cut it that close, when it's that close to being a majority or minority of preferred, I mean, it just as easily could have worked out a different way. I mean, it's not like it was so heavily stacked on the offers that it guaranteed that the number of people who showed up were the preferred employees were still going to be a minority no matter what. Correct? Sure. And I don't know that the fact that the employer's gamble may not have paid off detracts from the fact that the board found that it engaged in an unlawful hiring scheme. Your Honor is absolutely correct. It's possible that...we know, though, that they had fixed the hire of 51. That was the top number of preferred applicants. And as the employer makes very clear in its brief, it would have continued to hire to dilute the majority, to dilute the class, to ensure that the majority was not those of predecessor employees. So I don't know that...sure, the gamble, like you said, as Your Honor stated, sure, the gamble may not have paid off, but the fact is that they engaged in that gamble. That's the issue. They engaged in a process that was aimed at an effective...they achieved their goal and that they aimed at not hiring a majority of employees. That they could have hedged their bets the wrong way doesn't take away from the fact that they didn't, if that makes sense to Your Honor's question. This is Judge Baker. But isn't the board trying to have it both ways as far as this 883 analysis is concerned? On one hand, you're trying to put the relevant number at the top, determining what the total number is, as Judge Newsom said, the denominator. But then you're holding it against the board that there's 107 offers out there. So even if we were to add these...if you want to use 107, if we add everybody back in or even more people because they continued to hire, the percentage just isn't there, correct? Sorry, I didn't mean to cut you off. My question is that you're shifting a lot of numbers around here and it seems the board's shifting them to its own benefit and not paying attention to what Mr. Rainey pointed out, that this was an ongoing hiring process, as indicated by the fact that they made 107 offers. I see my time is up. May I answer your question? Yeah, please respond. Sure. And I understand that. It's the case in all of these successor cases that it's difficult to figure out the numbers, which is why there are some bright line rules absent extraordinary circumstances or absent of showing that those under board law, that the date has to be fixed at some point to determine whether there's a successor. You have to be able to figure out how many employees there are to figure out is there a majority? So there has to be some date where that number is now fixed. And so the board law is absent of showing from the employer that they are going to do sort of staggered hiring or hiring in waves, which this employer didn't do. I know in hindsight, they're saying they would have hired all these other people or they continued. But at the end of the day, I think the evidence in the record shows that roughly they hovered around 100 to 105 employees. There wasn't going to be a rash of hiring. So the board applied its standard rule in the absence of any evidence that the employer was going to engage in sort of a different sort of wave hiring process, that it will fix the date on which it will look at the numbers, not to put things in the board's favor, but because there has to be finality. There has to be some date that we look at so that objectively we can then examine what is going on as of this date. Is there a majority? Is there not a majority? What happened leading up to that? Because if you had sort of this floating date and this number, you would never be able to ascertain whether there's a majority on any specific date. So they applied its standard rule here, dated the takeover, who's on the rolls, where did they come from, and on the basis of those numbers. And again, I don't think that it's fair to say the board either had it both ways or looked at them in its favor. It applied its standard application of successorship law. And again, I know these cases sometimes can be a little unsatisfying in terms of the numbers, but at the end of the day, under the deferential standard of review, the board's decision here traps with the successor cases. Unless there are any other questions, I'm well over my time. So I will say the board is seeking full enforcement of its order in this case, and I thank you for your time. Thank you so much. All right, Ms. Wheeler. Oh, good morning. This is May it Please the Court. This is Karen Wheeler. I represent the intervener, United Steelworkers Union, in this case. It's correct, as Ms. Sheehy argued, that in applying the substantial and representative complement rule in assessing the composition of the workforce, the board was merely applying fall, live or dying, the Supreme Court case, where the Supreme Court decided there's a good reason to take a snapshot of a particular date in which a company is in operation and is in substantial continuity of operations in order to make that assessment. It can't have a constantly moving target that would allow an employer to manipulate the workforce or to just choose the most convenient date. However, you can also look at the hiring process and the company's intent during that process when it did not know the date on which a representative complement would be assessed, and it didn't know the total number of employees that would end up accepting or rejecting offers for sure, and look at its intent during that process and its actions during that process and its sort of course of conduct in hiring to assess whether it had a discriminatory motive in implementing this unlawful hiring scheme. And I just want to bring up something else that has not yet come to the fore in this case. There are four employees here who lost their jobs. They were caught up in this unlawful hiring scheme really without any fault of their own. They weren't terminated. These employees were already working at Ridgewood Nursing Home, and the transition that took their jobs should have been a very simple one. They were caring for residents in this home in Jasper, Alabama for years. They had perfectly fine work histories. Their interviews were uneventful. They were reassuring. All the employees had been reassured that when Ms. Brown took over operation of the facility, which she already owned, nothing would change. 99.9% of current employees would be rehired. And there was no change in patience when Brown took over. These four employees could have continued just caring for their same patients, and their interviews were uneventful. They were caught up in this latent game and completely calculated decision to create a new rule for the hiring process in order to play the numbers game. Sure, this rule was in effect at a different facility. It has not been in effect at this facility. And it was an attempt to engineer the numbers and to engineer the majority status of the predecessor employees. And these women who were simply seeking to continue caring for the residents of this nursing home, they deserve their jobs back. They deserve back pay. I want to ask you something that Mr. Ramey raised in his argument regarding the fact that the board provided what he called a three-legged stool, three pieces of evidence to support its conclusion that Ridgewood Services was motivated by discriminatory animus in hiring. That being the interview questions, I believe Brown's questions about closing if a union was formed, and then Cooper's threat to Boilinger about union recruiting. He said that if one of those legs of that stool or if this court finds that one of those legs of that stool should not have been considered as a piece of evidence of discriminatory animus, then we have to remand at least. Do you agree with that? No, the intervener does not agree with that. The finding of animus was based on those factors. The finding of animus is part of the prima facie case. It merely establishes that there is anti-union animus out there by the employer and that it was at play during the hiring process. Any of those, first of all, any of those incidents are more than sufficient to establish that there was some animus. But the board also looked at the whole course of conduct and looked at its factors in planned building services. The case that shows how right lines should apply in a discriminatory hiring scheme case to look at the whole hiring scheme and the hiring process to demonstrate the discriminatory motive. Certainly animus has to be established to establish a prima facie case to enable that analysis. Certainly the coercive interrogation on its own is absolutely sufficient. Your argument has expired. Thank you. I will rest then. Thank you so much. All right, Mr. Ramey, you've got three minutes in rebuttal. Mr. Ramey, you might be on mute. This is Travis Ramey for the petitioner. Just some quick points in rebuttal. Ridgewood didn't decide to hire 101 people on October 1st. That's really just sort of where it ended up. It continued hiring not to dilute the labor pool, but it was hiring to meet its clients' needs. There's no evidence I know of in the record that the number was ever again as low as 101. Six weeks later it was 112. A year or so later it was somewhere between 103 and 105. You can use October 1 as a fixed date to assess majority status, but the need for a fixed date does not mean that the court has to employ this one-in-one-out idea that the board has come up with. Judge Baker, you mentioned the board trying to have it both ways as far as 101 and 107, but I think that's not the only place. The board uses Ms. Cooper's statement to show animus, and it attempts to show a nexus to that by tying that to her recommendation as far as Vegas Wilson. But the ALJ didn't credit the testimony as to Vegas Wilson, and that's how she survives the pretext part of the right-line analysis. So you can't have that both ways. That statement either happened or it didn't. If it didn't happen, there's no nexus. If it did, then there's not a pretextual reason. The board comes up with this idea of a hiring scheme based on an inference of late adoption plus animus, but that doesn't necessarily show manipulation of the hiring process. That doesn't get there. Effectively, it's allowing the board to just find animus and then sort of assume all of the rest of it. As far as the three-legged stool issue, the board agrees. If you look at page 34, note 10 of their brief, the board agrees that if one of these legs is chopped out, that this needs to go back to the board. Case law backs that up. If you look at, for example, the Fogo de Chao decision from the D.C. Circuit, it says that you remand unless you can say that the board would have clearly acted the same way. At best, the three-legged stool won't always stand up. It might. I think here we have a no-legged stool or at best maybe a one-legged stool because interrogation and Cooper's statements both go. The validity of Brown's October comment is questionable also, but if any of these legs goes out, I think at minimum the court ought to remand the case unless it concludes that there's just no way the stool will stand, in which case the court can find no animus on its own. Your Honor, Ridgewood would request that the court grant the petition and deny enforcement. All right. Very well. Thanks to all counsel. Well presented on both sides. The case is submitted.